IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| DANIEL M. MALONE, ) | |
| ) | CASE NO. BK10-81962-TJM |
| Debtor(s).    ) | A12-8034-TJM |
| RICHARD D. MYERS, Trustee of the ) | |
| Chapter 7 bankruptcy estate, ) | |
| ) | |
| Plaintiff, ) | CHAPTER 7 |
| ) | |
| vs. ) | |
| ) | |
| FIDELIS, L.L.C., ) | |
| ) | |
| Defendant. ) | |

ORDER

This matter is before the court on the defendant's motion for summary judgment (Fil. No. 13) and objection by the plaintiff (Fil. No. 28). Sam King represents the plaintiff, and Albert B. Kerkhove represents the defendant. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

The motion is denied.

The debtor and his wife owned a Nebraska corporation called Investment Properties Resources, Ltd. ("IPR") and conducted real estate brokerage and property management activities. In 2008, the debtor sold IPR to Fidelis, L.L.C., a limited liability real estate company owned by his son. Thereafter, the debtor worked for Fidelis. The debtor filed a Chapter 7 bankruptcy petition on July 7, 2010, and Richard Myers was appointed trustee. Mr. Myers filed this adversary proceeding against Fidelis, alleging that the debtor fraudulently transferred IPR to Fidelis for less than a reasonably equivalent value in an effort to hinder, delay, or defraud creditors. Fidelis has now moved for summary judgment, arguing that no asset transfers occurred, no fraud occurred, and no fraudulent transfers occurred.

Summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The court must examine the record to ascertain whether the movant, through depositions, answers to interrogatories, admissions, affidavits, and other evidence, has demonstrated the absence of a genuine issue of material fact. Beard v. Banks, 548 U.S. 521, 529 (2006). If the movant has done so, then the non-

moving party, bearing the burden of persuasion, must by affidavit or otherwise set forth specific facts showing that there is a genuine issue for trial. Id. The court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue. Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. Co., 536 F.3d 939, 943-44 (8th Cir. 2008). An issue is genuine if it has a real basis in the record, and a genuine issue of fact is material if it might affect the outcome of the suit. Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion and give that party the benefit of all reasonable inferences to be drawn from the record, without resorting to speculation. Hitt v. Harsco Corp., 356 F.3d 920, 923-34 (8th Cir. 2004).

The following facts are uncontroverted or established by the evidence:

1.  IPR was incorporated November 14, 1984, to conduct as its principal business real estate brokerage activities. IPR also conducted real estate property management activities. IPR was owned 50 percent by the debtor Daniel Malone and 50 percent by his wife, G. Jeanne Malone.

2.  For many years, IPR operated profitably. Daniel Malone served as IPR's managing real estate broker. He also sold real estate and conducted other real estate-related sales work as a commissioned real estate salesperson.

3.  Between 2005 and 2009, Daniel Malone earned about $250,000 each year from his commercial real estate business.

4.  Daniel Malone also possessed an ownership interest in California Housing, L.L.C., and its successor, Via Christe, LLC.

5.  IPR managed Via Christe's property.

6.  In December 2004, IPR hired an employee who, unbeknownst to Daniel Malone at the time, began making unauthorized transactions in the accounts of IPR and other entities. She began a check-kiting scheme that escalated until it was discovered on August 5, 2008.

7.  The investigation into the check-kiting scheme revealed that the employee made improper entries in several accounts including a title insurance agency trust account for A G Ventures, L.L.C., a company that was principally owned by Daniel Malone.

8.  On August 12, 2008, the Nebraska Department of Insurance closed the title insurance agency. United General Title Insurance Company and Bank of Nebraska began audits to make claims against Daniel Malone personally and against other entities.

9.  Daniel Malone's son Mark had worked for IPR since he was 16 years old. He began working full-time as a licensed real estate salesperson for IPR in May 2005 at the age of 20.

10. In 2008, Daniel Malone was interested in selling IPR and Mark Malone was interested in forming his own commercial real estate brokerage, so Mark organized Fidelis for that purpose. Fidelis was organized on June 16, 2008, with Daniel and Mark Malone as managing members.

11. On July 1, 2008, Daniel Malone prepared a personal financial statement in which he valued IPR at $165,000, with $60,000 in equity.

12. After the financial irregularities of the check-kiting scheme came to light, Daniel and Mark Malone agreed that Daniel should no longer serve as a member of Fidelis. Daniel Malone was officially removed as a member of Fidelis on August 15, 2008.

13. Fidelis agreed to purchase IPR. Daniel and Mark Malone drafted the Asset Purchase Agreement, effective September 1, 2008.

14. Mark Malone identified and valued the property listed in the invoice that is part of the Asset Purchase Agreement, namely office furniture, equipment, accounts receivable, the office lease, and "[a]ll of the Seller's inventory, merchandise, know-how, operating instructions, supplies, client files, rights to customer lists, telephone numbers, directory listings, trade secrets, advertising materials, goodwill, the name Investment Property Resources, Investment Property Resources, Ltd., IPR, and all derivatives thereof and general intangibles pertaining to the Business[.]" IPR's property management contracts were not part of the sale.

15. The purchase price for these assets was $5,500, which represented $500 for IPR's name, files, goodwill, etc., $4,000 for the office furniture and equipment, and $1,000 for the office lease. Values for the equipment and furniture were obtained from online auction sites selling comparable used business equipment and furnishings.

16. An Addendum to the Asset Purchase Agreement was drafted and signed on September 10, 2008, to clarify that Fidelis

> does not intend to assume any past or continuing liabilities of [IPR] with the exception that [Fidelis] agrees to take responsibility for the repayment of a certain Lease Agreement between The Chandler Company, LLC as Lessor and Investment Property Resources, Inc. as Lessee. . . . It is also understood that this lease agreement is a consolidated lease agreement incorporating the liabilities of two other outstanding leases between The Chandler Company, LLC and Investment Property Resources, Inc. . . . This lease agreement, being assumed by FIDELIS, LLC calls for 48 monthly payments of $836.70 for a total amount to be repaid by Fidelis, LLC of Forty Thousand One Hundred Sixty One Dollars and 16/100 [sic] ($40,161.60).

17. The lease with the Chandler Company was for a computer and vehicles. Fidelis made the lease payments and used the leased property.

18. Via Christe, through its managing member Daniel Malone, retained Fidelis to provide

property management services.

19. The Via Christe contract brought Fidelis nearly $34,000 in income for the period of September 2008 through December 2008, and more than $100,000 in income each year from 2009 through 2011.

20. Daniel Malone has served as managing broker for Fidelis since January 1, 2008.

21. In June 2011, Mark Malone sold his ownership interest in Fidelis to his sister for $1.

22. IPR had not paid all of its tax liabilities, although both IPR and Daniel Malone had made payments on those liabilities. In August 2008, Mark Malone was aware of the existence of Internal Revenue Service tax liens, but he did not know the nature and extent of those liens. Fidelis has never challenged the validity of the liens.

23. No later than February 2009, work began on an application for certificate of discharge of the federal tax liabilities. The application was completed and dated by Daniel Malone on May 16, 2009. It was submitted to the Internal Revenue Service on June 8, 2009. To date the Internal Revenue Service has not acted on the application.

24. The transfer of IPR to Fidelis was not disclosed in the Statement of Financial Affairs filed with Daniel Malone's bankruptcy petition.

25. Daniel Malone's bankruptcy schedules list an undisputed claim of $24,000 held by the IRS for unpaid trust fund payroll taxes for IPR for all quarters in 2005 and the first quarter of 2006, as well as an undisputed claim of $100,802.63 held by the IRS for unpaid trust fund payroll taxes for A.G. Ventures for all quarters in 2005 and the first quarter of 2006.

26. Dennis Walker filed a lawsuit against Daniel Malone in 2003. A judgment in excess of $600,000 was entered against Mr. Malone and another person in December 2005.

27. In 2004, John Moylan loaned Daniel Malone $280,000. Payments of $215,000 have been made on the loan, leaving a balance due of $65,000. This debt was listed as unsecured in Mr. Malone's bankruptcy schedules.

The Bankruptcy Code provides the trustee with authority to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a hypothetical judicial lien creditor or a hypothetical creditor holding an unsatisfied writ of execution against the debtor. 11 U.S.C. § 544(a). The trustee may also "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim[.]" 11 U.S.C. § 544(b)(1). "Applicable law" in this instance is the Nebraska Uniform Fraudulent Transfer Act ("UFTA"). The advantage for the trustee, standing in the shoes of an unsecured claim holder, is a four-year look-back period.

A transfer by a debtor is fraudulent as to present and future creditors if the debtor made the

transfer:

    1.    with actual intent to hinder, delay, or defraud any creditor, or
    2.    without receiving a reasonably equivalent value in exchange for the transfer, and the debtor:
(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation; or
(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Neb. Rev. Stat. § 36-705(a).

A transfer is fraudulent as to creditors whose claims arose before the transfer was made if the debtor did not receive a reasonably equivalent value for the transfer and the transfer occurred while the debtor was insolvent or it caused him to become insolvent:

Transfers fraudulent as to present creditors
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider knew or reasonably should have known that the debtor was insolvent.

Neb. Rev. Stat. § 36-706.

In an action seeking to set aside a fraudulent transfer, the burden of proof is on a creditor (trustee in a bankruptcy case) to prove, by clear and convincing evidence, that fraud existed in a questioned transaction. Comcast of Illinois X v. Multi-Vision Elec., Inc., 504 F. Supp. 2d 740, 748 (D. Neb. 2007); Eli's, Inc. v. Lemen, 591 N.W.2d 543, 555 (Neb. 1999) (citing Dillon Tire, Inc. v. Fifer, 589 N.W.2d 137 (Neb. 1999)). Clear and convincing evidence is "that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." Id. at 555-56 (quoting Dillon Tire, 589 N.W.2d at 142).

The trustee also proposes to avoid the transfers under 11 U.S.C. § 548(a)(1)(B), which deals with constructively fraudulent transfers. It does not require a showing of intent. Rather, it requires the trustee to prove the debtor's insolvency at the time of, or as a result of, the transfer, and the debtor's receipt of less than a "reasonably equivalent value" in the exchange. Both are fact questions, with the trustee bearing the burden of proving the elements of § 548 and the transferee carrying the burden of proving that the transfer was for reasonably equivalent value and the debtor remained solvent after the transfer. See Dietz v. St. Edward's Catholic Church (In re Bargfrede), 117 F.3d

1078, 1080-81 (8th Cir. 1997).

In evaluating the issue of reasonably equivalent value, the Bankruptcy Appellate Panel of the Eighth Circuit has explained the necessary analysis:

> To succeed on a claim under 11 U.S.C. § 548(a)(1)(B)(i), the Chapter 7 Trustee must demonstrate, by a preponderance of the evidence, that payments a debtor made were not in exchange for reasonable equivalent value. Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R. 602, 612 (8th Cir. B.A.P. 2001). "This requires analysis of whether: (1) value was given; (2) it was given in exchange for the transfers; and (3) what was transferred was reasonably equivalent to what was received." Id. The payment of money is unquestionably the giving of "value." 11 U.S.C. § 548(d)(2)(A). When evaluating a transfer for reasonable equivalency of value as compared to a money payment, a court must examine the whole transaction and measure all the benefits – whether they be direct or indirect. Christians v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1407, 1415 (8th Cir. 1996) (holding that the trustee could not recover tithes to a church under 11 U.S.C. § 548), vacated, 521 U.S. 1114, 117 S. Ct. 2502, 138 L. Ed. 2d 1007 (1997) (vacating for further consideration on the legitimacy of the Religious Freedom Restoration Act), reinstated, 141 F.3d 854 (8th Cir. 1998), cert. denied, 525 U.S. 811, 119 S. Ct. 43, 142 L. Ed. 2d 34 (1998). If the measure for reasonable equivalency is the value of an indirect benefit then that benefit must be tangible. Richards & Conover Steel, Co., 267 B.R. at 612-13.

Meeks v. Don Howard Charitable Remainder Trust (In re S. Health Care of Ark., Inc.), 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004).

The threshold question in a fraudulent transfer action is whether a "transfer" of "assets" occurred. Ries v. Wintz Prop., Inc. (In re Wintz Cos.), 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999). Fidelis asserts that no "assets" of the debtor were transferred to it, so UFTA does not apply. The statute defines an asset as "property of a debtor, but the term does not include property to the extent it is encumbered by a valid lien." Neb. Rev. Stat. § 36-702(2)(i). A valid lien is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." Neb. Rev. Stat. § 36-702(13). A lien is "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien." Neb. Rev. Stat. § 36-702(8). Fidelis takes the position that the notices of federal tax lien filed in 2006 and 2007, which had a total balance of approximately $90,000 at the time the asset purchase agreement between IPR and Fidelis was signed, exceeded the value of the IPR property transferred to Fidelis. According to the asset purchase agreement, the assets acquired by Fidelis were worth just $5,500. Accordingly, argues Fidelis, there were no unencumbered assets which the debtor could have transferred to Fidelis.

Fidelis's argument may have merit if it were reinforced by credible valuations. As it stands, the alleged value of the assets sold presents a clear factual issue that will require additional evidence.

The discrepancy between the debtor's valuation of IPR at $165,000 on July 1 and Mark Malone's valuation of IPR's assets at $5,500 in September raises a concern. The debtor intimates that the embezzlement scandal that came to light in the intervening months severely devalued IPR. There may also be accounting reasons for not comparing the two values head-to-head. Nevertheless, further evidence of the assets' actual value and a reasonable explanation of the value discrepancy are necessary before a determination can be made as to whether a "transfer" in fact occurred.

The same issues of valuation are also relevant to the determination of whether the debtor received a reasonably equivalent value for the transfer and whether he was solvent after the transfer.

The Nebraska fraudulent transfer statute lists 11 "badges of fraud" that may be considered when determining actual intent under § 36-705(a)(1). Those factors are:

1. whether the transfer was to an insider;
2. whether the debtor retained possession or control of the property transferred after the transfer;
3. whether the transfer was disclosed or concealed;
4. whether before the transfer was made, the debtor had been sued or threatened with suit;
5. whether the transfer was of substantially all the debtor's assets;
6. whether the debtor absconded;
7. whether the debtor removed or concealed assets;
8. whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Neb. Rev. Stat. § 36-705(b).

1. Insider

When the debtor is an individual, "insider" includes:

(A) a relative of the debtor or of a general partner of the debtor;
(B) a partnership in which the debtor is a general partner;
(C) a general partner in a partnership described in subdivision (B) of this subdivision;
(D) a limited liability company of which the debtor is a member; or
(E) a corporation of which the debtor is a director, officer, or person in control[.]

Neb. Rev. Stat. § 36-702(7)(i).

While Fidelis was an insider of the debtor's when it was formed because the debtor was a member of Fidelis at that time, the debtor was no longer a member at the time of the transfer and evidently was only an employee when the transfer occurred.

2. Retention of possession or control of property

After the transfer, Fidelis took over IPR's office location and the debtor served as Fidelis's managing broker and handled a significant amount of the property management and real estate sales work undertaken by Fidelis, so he still was very involved with the property that he transferred.

3. Disclosure of transfer

The debtor asserts that the transfer was disclosed to relevant creditors. It was not disclosed on the debtor's bankruptcy schedules.

4. Suit or threat of suit

At the time of the transfer, there were judgments outstanding against the debtor. Creditors had also begun auditing the debtor and his business entities in light of the embezzlement scandal. The debtor stated that he and his son agreed he should be removed as a member of Fidelis shortly after the embezzlement was discovered, out of concern that Fidelis could become embroiled in lawsuits related to the financial irregularities affecting IPR and related entities.

5. Transfer of substantially all assets

IPR's hard assets, intangibles, leasehold interest, accounts receivable, and "all assets . . . owned by and used by [IPR] for the Business" were transferred to Fidelis. The debtor owned fifty percent of these assets, but it is unclear what portion of his total assets they constituted.

6. Abscondence

The debtor has not absconded.

7. Concealment of assets

There is no evidence that assets were removed or concealed.

8. Reasonably equivalent value

As noted above in the discussion of whether the property transferred had any unencumbered value that could constitute "assets," there are significant factual questions that need to be answered before appropriate valuations can be determined.

9. Insolvency

A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation, or if the debtor is generally not paying its debts as they become due. Neb. Rev. Stat. § 36-703.[1] Insolvency is generally a question of fact. J.L. Brock Builders, Inc. v. Dahlbeck, 391

---

[1]The statute provides in part:

(continued...)

N.W.2d 110, 116 (Neb. 1986).

Additional evidence is needed as to whether the debtor was insolvent or became insolvent shortly after the transfer was made.

10. Timing of transfer
The evidence indicates that substantial debts existed before the transfer was made, and that the debtor faced the possibility of additional lawsuits arising from the embezzlement.

11. Transfer to lienor
The transfer was not made to a lienholder.

After considering the evidence and arguments provided by the parties, and In light of the facts that need to be established before it can be determined whether the trustee can establish the elements of a fraudulent transfer and his right to recover the property, the motion for summary judgment must be denied.

IT IS ORDERED: The defendant's motion for summary judgment (Fil. No. 13) is denied. The case will be scheduled for trial.

DATED:   March 12, 2013

BY THE COURT:

/s/ Timothy J. Mahoney
United States Bankruptcy Judge

Notice given by the Court to:
\*Albert B. Kerkhove    Sam King
U.S. Trustee

Movant (\*) is responsible for giving notice to other parties if required by rule or statute.

---

[1](...continued)
36-703. Insolvency
    (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
    (b) A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.
    . . .
    (d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under the Uniform Fraudulent Transfer Act.
    (e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.